UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CAROL L. DOAN,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        No. 03 C 7914
                                        )
JO ANNE BARNHART, COMMISSIONER          )        Judge Rebecca R. Pallmeyer
OF SOCIAL SECURITY,                     )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Carol L. Doan[1] claims she is disabled by depression. She filed this action against Jo Anne B. Barnhart ("Defendant") challenging the final decision of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. § 401 *et seq.* (Title II); § 1381 *et seq.* (Title XVI). The parties have filed cross-motions for summary judgment. For the reasons set forth below, the case is remanded to the ALJ for further proceedings.

## PROCEDURAL HISTORY

On October 18, 2001, Plaintiff filed an application with the SSA for Title II DIB and Title XVI SSI benefits, alleging that she has been disabled and unable to work since October 10, 2000 due to depression and headaches. (Record ("R.") 97-99, 111.) The SSA denied her application on January 9, 2002, concluding that although Plaintiff has some restrictions on her ability to function, she is not disabled because she retains the ability to do unskilled work. (R. 52-56.) The SSA denied

---

[1]     Plaintiff has also used the names "Huong Thi Le" and "Huong T Le". (Record 97, 102.)

Plaintiff's request for reconsideration for the same reason on February 27, 2002. (R. 57-58, 60-63.) Plaintiff requested and was granted a hearing before Administrative Law Judge ("ALJ") Cynthia M. Bretthauer on September 11, 2002. (R. 67, 73-76.) After hearing testimony from Plaintiff and a medical expert, ALJ Bretthauer adjourned the hearing until a later date in order to obtain further medical records. (R. 47-48.) The ALJ scheduled a second hearing for October 22, 2002, (R. 85-88), but cancelled it on October 21. (R. 96). Without hearing any further evidence, the ALJ issued her decision on March 20, 2003. (R. 10-11.) She concluded that Plaintiff was not disabled because her impairments did not preclude performance of her "past relevant work as a packer or in factory assembly." (R. 10, 13-18.) The Appeals Council denied Plaintiff's request for review on October 3, 2003, (R. 5-7), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the SSA's final decision.

## FACTUAL BACKGROUND

### A. Plaintiff's Personal and Work History

Plaintiff was born in Vietnam on October 24, 1959 and came to the United States in 1984 or 1985.[2] (R. 25, 102.) She received an eighth grade education in Vietnam, (R. 117), and her English is limited.[3] (R. 24-25, 110.) Plaintiff was married in 1978 in Vietnam but divorced in 2001. (R. 97.) She lives with a female cousin, (R. 25, 34, 110), and has one daughter who lives elsewhere. (R. 36, 39.) A second daughter died in a drowning accident in 1988. (R. 38-39, 326.)

---

[2]       Plaintiff is an American citizen. (R. 97.)

[3]       On her initial disability application, Plaintiff indicated that she cannot speak, read, or write more than her name in English. (R. 110.) At the hearing before the ALJ, Plaintiff testified that she could speak, read, and write "a little bit" of English, but she testified with the aid of a Vietnamese interpreter. (R. 21, 24-25.)

2

Plaintiff worked as a waitress from 1991 to 1994, and then at an electronics factory from 1994 to October 2000. (R. 112.) Plaintiff testified that her work at the factory involved only "packing," (R. 26-27, 112), but indicated on her Work History Report that she was an "assembly worker" who assembled parts for televisions and computers using technical knowledge or skills. (R. 120, 122.) Plaintiff asserts that she quit her job at the factory in October 2000 because of depression and headaches. (R. 28-29.) Plaintiff also worked part time as a cook at a bakery and café during unspecified months in 2000 and 2001. (R. 120, 123.)

## B. Medical History

### 1. Edgewater Hospital

Although Plaintiff claims onset of her depression in October 2000,[4] (R. 27, 97), the first medical records of any mental problem date from September 14, 2001, when Plaintiff checked into a hotel room and tried to kill herself with an overdose of Tylenol. (R. 159-60, 184.) Plaintiff had called her daughter to notify her of the planned suicide attempt, and the daughter brought Plaintiff to Edgewater Hospital where she was admitted and diagnosed with acetaminophen overdose, suicide attempt, and recurrent depression with psychosis. (R. 157-60, 184.) The emergency room report stated that Plaintiff was depressed over her recent divorce and had made no prior suicide attempts. (R. 159-60.) The following day, on September 15, 2001, Edgewater discharged her to Chicago Read Mental Health Center. (R. 185-86, 189.)

---

[4]     On her initial disability application, Plaintiff claimed she became disabled on October 10, 2000. (R. 97, 330.) On questionnaires dated November 23, 2001, (R. 128-30), and February 14, 2002, (R. 141-143), however, Plaintiff listed the onset of her problem as September 2001. (R. 129, 141.)

3

## 2. Chicago Read Mental Health Center

At Chicago Read, Plaintiff underwent an initial psychiatric evaluation. (R. 189-200.) Through an interpreter, Plaintiff reported that she had not eaten or slept for a week before the suicide attempt. (R. 191.) The evaluating psychiatrist[5] assessed Plaintiff's mental status as anxious, depressed, and fidgety, with poor impulse control when overwhelmed with emotional stress. (R. 194.) Plaintiff was diagnosed with depressive and adjustment disorders and assigned an Axis V Global Assessment of Functioning ("GAF") of 20-30.[6] (R. 195.) The psychiatrist concluded that Plaintiff was a danger to herself and should be involuntarily admitted to Chicago Read. (R. 196.)

Plaintiff received treatment at Chicago Read until September 24, 2001. (R. 205-24.) In a September 17, 2001 form assessing Plaintiff's degree of suicide risk, Dr. Pauie Philippe noted the recent suicide attempt but wrote, without elaboration, that Plaintiff "realized that she did a wrong thing." (R. 215.) The following day on September 18, 2001, Plaintiff applied for voluntary admission status. (R. 217.) By September 21, her symptoms had improved; the treatment notes from that day state that Plaintiff "finally accepted the fact that she has a problem," that she acknowledged having been depressed since her separation from her husband, and that she agreed to

---

[5]     The evaluating psychiatrist is not identified in the record, and the court is unable to discern the doctor's printed or signed name. (R. 200.)

[6]     The Axis V rating reflects the clinician's judgment of the patient's overall level of functioning, as expressed by the GAF score. *See* AMER. PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-33, (4th ed., text rev. 2000) [hereinafter "DSM-IV"]. A GAF of 20-30 means that the patient's behavior is considerably influenced by delusions or hallucinations, that there is serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, preoccupied with suicide), or that the patient has an inability to function in almost all areas. *Id.* at 34.

4

see a therapist when she left Chicago Read. (R. 220.) Chicago Read arranged for Asian Human Services ("AHS") to treat Plaintiff after discharge from Chicago Read.[7] (R. 220-22.)

Plaintiff was discharged on September 24, 2001 with prescriptions for Ambien (10 mg) and Zoloft (50 mg),[8] (R. 223), and an appointment to see Dui Ngyn at AHS on September 25. (R. 222.) The discharge summary from Chicago Read stated that Plaintiff would "see the psychiatrist as well as have counseling for separation and loss issues," presumably at AHS. Plaintiff apparently did not keep her September 25 appointment with Dui Ngyn; the first documentation from AHS is a psychiatric evaluation by Dr. Lewis dated January 28, 2002. (R. 234.)

### 3. Dr. Nelson, Bureau of Disability Determination Services

On December 4, 2001, nearly three months after Plaintiff's suicide attempt and subsequent hospitalization, she underwent a psychiatric evaluation for the Bureau of Disability Determination Services ("DDS"). (R. 227-29.) Dr. Allan D. Nelson noted that Plaintiff was well-developed and well-nourished, but "quite depressed, withdrawn, and preoccupied." (R. 227.) Plaintiff told Dr. Nelson that she had been depressed for many years. (Id.) Despite her recent hospitalization, Plaintiff

---

[7]      The record does not reveal exactly what AHS does, or what services it offers beyond psychiatric treatment. The court notes that its Chicago address, 4753 N. Broadway, (R. 222), is several blocks away from Plaintiff's apartment at 1123 Argyle, in a predominantly Vietnamese neighborhood. (R. 5.) *See* Yahoo! Maps, *at* http://maps.yahoo.com/dd_result?newaddr= 4753+n+broadway&taddr=1023+W+Argyle+St&csz=chicago%2C+il&country=us&tcsz= Chicago%2C+IL+60640-3716&tcountry=us (last visited May 6, 2005).

[8]      Ambien is used in short-term treatment of insomnia. PHYSICIANS' DESK REFERENCE 2980 (59th ed. 2005). Zoloft is used in the treatment of mood disorders including major depressive disorder. *Id.* at 2682-83.

apparently told Dr. Nelson that she had "never been hospitalized psychiatrically" and was currently taking no medication nor receiving any psychiatric treatment. [9] (*Id.*)

Dr. Nelson found no signs of any formal thought disorder such as hallucinations, delusions, or paranoid ideation, and determined that Plaintiff was orientated for time, date, place, and person. (R. 228.) He found no impairments in memory or abstract functioning, and noted that Plaintiff's judgment was "relatively intact." (R. 228-29.) Dr. Nelson concluded, however, that Plaintiff had been "chronically depressed for a number of years," and noted that she experienced frequent headaches, frequent crying spells, persistent feelings of low self-esteem, difficulties concentrating, chronic insomnia, and significant social withdrawal. (R. 229.) He also noted a history of suicidal ideation, including two suicide attempts.[10] (*Id.*) Dr. Nelson diagnosed Plaintiff as having an "adjustment disorder with depressed mood" and stated that her "overall prognosis psychiatrically is guarded to fair." (*Id.*)

### 4. State Agency Psychologists

On December 27, 2001, David Brister, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. Dr. Brister found that Plaintiff was "moderately limited" in her ability to understand and remember very short and simple instructions, but "not significantly limited" in any of the twenty other categories on the questionnaire. (R. 230-31.) Based on his review of Plaintiff's progress notes from Chicago Read and

---

[9]     Dr. Nelson noted that "due to [Plaintiff's] mental state and the language barrier it was difficult to communicate with her," and that she "had trouble answering many of the questions," even with the aid of an interpreter. (R. 228.)

[10]     The court assumes that the September 14, 2001 suicide attempt was the second; the record contains no further information, however, about any prior attempt.

6

the assessment from Dr. Nelson, Dr. Brister opined that Plaintiff could perform simple, unskilled work at the substantial gainful activity level. (R. 232, 252.) Dr. Brister also completed a "Psychiatric Review Technique" form which evaluated Plaintiff's functional limitations in four areas. (R. 250.) He found that Plaintiff had mild restrictions in activities of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace; he made no finding as to the fourth category, "repeated episodes of decompensation."[11] (Id.)

On February 20, 2002, another state agency psychologist, M.A. Wharton, Ph.D., affirmed Dr. Brister's RFC and functional limitation assessments as his own. (R. 232, 240.) Neither Dr. Brister nor Dr. Wharton ever examined Plaintiff.

### 5.  Dr. Lewis, Treating Psychiatrist

On January 28, 2002, Dr. Jonathan Lewis, a psychiatrist at AHS, completed an initial psychiatric evaluation of Plaintiff. (R. 234-36.) Dr. Lewis found Plaintiff's mental state to be "fearful, sad, tense, but oriented, coherent." (R. 235.) Dr. Lewis noted Plaintiff's history of depression and "suicidal feelings," and also discovered that Plaintiff had suffered the death of a daughter. (R. 234, 239.) Plaintiff related that she had become depressed after her daughter's death and that the depression worsened after her divorce. (R. 239.) She disclosed that she was having obsessive thoughts about her ex-husband and sometimes followed him to his house. (R. 236, 239.) She also acknowledged that she had been suicidal and had been "thinking about suicide in the future." (R. 239.) Dr. Lewis diagnosed Plaintiff with a major depressive disorder, assigned a GAF

---

[11]    Decompensation in the psychology context means an inability to maintain defense mechanisms in response to stress, resulting in personality disturbance or psychological imbalance. Dictionary.com at http://dictionary.reference.com/search?q=decompensation (last visited April 22, 2005).

7

score of 50,[12] and prescribed Zoloft (25 mg) and Remeron (30 mg).[13]  (R. 236-37.)  Dr. Lewis's notes also reflect that Plaintiff had had thyroid surgery at some point, but do not indicate a date.  (R. 235.)

Dr. Lewis's next progress notes, from March 18, 2002, indicate that Plaintiff's condition was improving.  (R. 238.)  Plaintiff reported "very good" results from taking the Remeron, and she told Dr. Lewis that she could sleep eight hours a night and that she awoke feeling refreshed and with increased appetite.  (Id.)  Dr. Lewis found Plaintiff's mental state to be oriented and coherent, with mobile affect, more energy, less depression, no suicidal ideation and no psychotic symptoms.  As a result, he discontinued the Zoloft.  (Id.)

On July 8, 2002, Dr. Lewis completed an RFC assessment at the request of Plaintiff's attorney.  (R. 257-61.)  He noted that he had seen Plaintiff every other month for medication management, and that the Remeron had improved her sleep.  (R. 257.)  Dr. Lewis assigned a GAF score of 45, noting that Plaintiff had been hospitalized due to severity of depression following the death of her daughter and her divorce, and for "having suicidal ideas."  (Id.)  He also wrote, however, that she was "no longer suicidal," and called her prognosis "good."  (R. 257-58.)

Dr. Lewis identified Plaintiff's signs and symptoms as anhedonia or a pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; feelings of guilt and worthlessness; and difficulty thinking or concentrating.  (R. 258.)  He

---

[12]       A GAF score of 41-50 indicates that the patient has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV, at 34.

[13]       Remeron (mirtazapine) is prescribed for the treatment of major depression.  PDR Health  Drug  Information,  at  http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/rem1371.shtml (last visited April 21, 2005).  The usual starting dose is 15 milligrams, which may be increased to as much as 45 milligrams a day.  Id.

rated Plaintiff's functioning in most work-related activities as "limited but satisfactory" in ten categories, "seriously limited but not precluded" in ten categories, and "unable to meet competitive standards" in five. (R. 259-60.) He explained his findings by stating that Plaintiff's "severe depression impairs concentration, pace, energy, and judgment." (R. 259.)

Dr. Lewis also completed a form to indicate the level of severity of Plaintiff's impairment in accordance with Listing 12.04 – Affective Disorders.[14] He circled the same symptoms that he had checked off on the RFC assessment, except that he did not circle the factor of "anhedonia or pervasive loss of interest in almost all activities." (R. 255.) Dr. Lewis concluded that these symptoms resulted in marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. (R. 256.) Dr. Lewis opined that Plaintiff met Listing 12.04 because "she was depressed enough to require hospitalization at the state mental hospital," (R. 254), although he did not clarify whether he was referring to Plaintiff's past hospitalization at Chicago Read after her suicide attempt, or whether her current depression was so severe as to require hospitalization.

C.    Plaintiff's Statements and Testimony

On November 23, 2001, Plaintiff completed an "Activities of Daily Living Questionnaire." (R. 128-31.) She stated that she cooked for herself, cleaned, vacuumed, dusted, shopped, and did

---

[14]    Appendix 1 to Subpart P of 20 C.F.R. § 404 is used to evaluate the severity of impairments. It lists 14 categories of impairments that may constitute a disability under the Social Security Act. It also describes how these medical conditions need to be documented in order to be "severe" enough to constitute a "disability." Section 12.04 is used to evaluate the severity of mental disorders such as depression.

laundry, and that her depression had led to "no major changes" in these activities other than that she "gets tired easily." (R. 128.) She reported no problems concentrating, thinking, remembering, or finishing things. (R. 129.) She did not hear voices, see phantoms, feel that anyone was trying to harm her, feel afraid of people, or get angry and fight with people. (R. 129-30.) Plaintiff reported that she could sleep well and that she "takes medication when needed," (R. 129), listing Zoloft and Ambien as her medications, and stating the precise dosages (50 mg and 10 mg). (R. 128.) Asked to describe her social activities and whether she liked people, Plaintiff reportedly responded, "[y]es, mingle with friends—talk stories—laugh—watch TV and visit other friends." (R. 129.)

When Plaintiff filled out the same questionnaire on February 14, 2002, however, after the SSA had denied her initial application, Plaintiff answered several questions differently.[15] (R. 140-43.) In this questionnaire, Plaintiff stated that she did not go shopping or do any household chores, and when asked to describe changes in such activities since her condition began, she answered "can't remember." (R. 140.) When asked to list her medications, Plaintiff answered "don't know name," and she now reported problems concentrating, thinking, and finishing things. She also stated that she was forgetful, that she heard voices and that she could not sleep well. (R. 140-41.) In addition, Plaintiff now indicated that she felt afraid of people because of "harassment," and that she tended to get angry and fight with people, "mostly with men." (R. 142.)

At her hearing before the ALJ on September 11, 2002, Plaintiff testified that she no longer drove anywhere, instead taking the bus for errands or relying on her cousin to drive her. (R. 26.) She stated that her depression had begun in October 2000 but that she had not gone to a doctor at

---

[15]    Both forms list the same person, "CBVillarota", as having helped Plaintiff complete the form. (R. 130, 143.)

that time because she had no insurance and did not know any doctors. (R. 28.) Plaintiff acknowledged that she did not go to AHS right after her discharge from Chicago Read on September 24, 2001, explaining that she was depressed and did not want to go anywhere. (R. 42.) She said that she saw Dr. Lewis once a month, but noted that she had skipped two months of appointments after her initial visit "because my head is [in] pain." (R. 30.) Plaintiff reported taking 30 mg of Remeron daily, and sometimes more than once a day, and confirmed that Dr. Lewis had discontinued her Zoloft prescription because he said she was feeling better. (R. 31-32.) When the ALJ asked if Plaintiff felt better in the past year, she answered, "I still feel depressed and very sad," but stated that she felt less depressed than she had a year earlier. (R. 33.)

Plaintiff testified that she does not cook, do laundry, do any grocery shopping, exercise, or visit family and friends, and that two or three days a week, she does not bathe, dress herself, or change. (R. 34-36.) She described her typical daily activities as watching TV and reading a Vietnamese book for an hour or a half hour, and she indicated that she attends Buddhist services once every three or four months. (R. 34-35.)

### D. Testimony of the Medical Expert

Dr. Daniel Schiff, a psychiatrist, (R. 82-84), testified at Plaintiff's hearing as a medical expert.[16] (R. 42-47.) He stated that the Zoloft dosage prescribed by Chicago Read was "quite modest" and that Plaintiff seemed to be responding to the Remeron.[17] (R. 43.) He also noted that

---

[16] Susan Entenberg, a vocational expert, attended the hearing but did not testify. (R. 21.)

[17] Dr. Schiff also stated that Plaintiff was "responding to Celexa at a modest dose." (R. 44.) The record contains no evidence that Plaintiff ever took Celexa (citalopram hydrobromide), which is a different drug than Remeron (mirtazapine). *See* PDR Health Drug Information, *at*
(continued...)

11

when Dr. Nelson examined Plaintiff on December 4, 2001, she was cognitively intact despite evidence of depression. (R. 43.)

When asked if there was sufficient information for him to render an opinion as to Plaintiff's impairments, however, Dr. Schiff answered "no." (R. 42.) He stated: "[c]ertainly this Claimant has a difficulty, but the record is not adequate for me to understand what's going on and I will tell you why." (Id.) Calling the record "perplexing," Dr. Schiff testified that it was hard for him to judge the severity of Plaintiff's depression. (R. 44.) He noted, for example, that the record did not contain a "robust mental status" from either Dr. Lewis or from Plaintiff's hospitalizations. (R. 43-44.) According to Dr. Schiff, the "most robust mental status" was presented by Dr. Nelson of DDS, (R. 43-44), who, as noted above, had evaluated Plaintiff's symptoms and cognitive abilities and diagnosed an "adjustment disorder with depressed mood." (R. 229.)

Dr. Schiff found Dr. Lewis's July 8, 2002 RFC assessment "internally contradictory" because Dr. Lewis wrote that Plaintiff was "no longer suicidal," yet indicated suicidal ideation when checking off Plaintiff's symptoms. (R. 44, 257-58.) Dr. Schiff stated that Dr. Lewis must have felt that Plaintiff was responding adequately to her medication because he never felt the need to increase her dosage; without more of Dr. Lewis's treatment notes, however, Dr. Schiff described himself as "stuck." (R. 44-45.) The lack of medical records was also a problem with respect to Plaintiff's past thyroid surgery, which Dr. Lewis mentioned in his initial evaluation. (R. 45.) Since thyroid

(...continued)

http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/cel1079.shtml (last visited May 6, 2005). Presumably, Dr. Schiff was referring to the Remeron, and simply misspoke.

12

problems can affect a diagnosis of depression, Dr. Schiff said, he needed Plaintiff's medical records from any possible thyroid surgery in order to "understand fully the depressive problem." (*Id.*)

### E.    Post-hearing Supplemental Information

After Dr. Schiff's testimony concluded, the ALJ adjourned the hearing and asked Plaintiff's attorney to obtain more of Dr. Lewis's treatment notes and thyroid surgery records so that Dr. Schiff would be able to render an opinion. (R. 45-46.) If Dr. Schiff could not do so after receiving the supplemental information, the ALJ stated, she would hold another hearing. (R. 46.) The ALJ scheduled a second hearing for October 22, 2002. (R. 85-88.)

After the hearing, Plaintiff submitted medical records from two visits to Thorek Hospital in 1992. (R. 262-324.) The first visit, dated March 25, 1992, involved the excision of a cyst in the Bartholin gland. (R. 262-80.) The second visit, dated May 4-7, 1992, involved the removal of pelvic adhesions and an appendectomy. (R. 281-324.) To the extent that none of these procedures involved the thyroid gland, there is no medical evidence to support Dr. Lewis's notation of past thyroid surgery.

On October 16, 2002, Dr. Lewis submitted a more elaborate report concerning Plaintiff's condition. He opined that although the Remeron improved her mood and sleep quality, "her depression is of the chronic and relapsing type, which continues to be disabling." (R. 326.) He noted that Plaintiff continued to have suicidal ideas, but that she did not act on them out of concern for her daughter. (*Id.*) He also found that Plaintiff had difficulty concentrating and remembering, and could not remember the contents of magazine articles or television shows she watched. (*Id.*) Dr. Lewis noted that Plaintiff had suffered severe depressions after major losses such as her daughter's drowning death, but indicated that other depressions occurred "without identifiable precipitants."

13

(*Id.*) He concluded that even in remission, Plaintiff's depression interfered with her ability to sustain concentration, follow directions, and sustain energy in the work setting. (*Id.*) Two days before the scheduled supplemental hearing before the ALJ, Dr. Lewis submitted additional treatment notes from September 9, 2002. In those notes, Dr. Lewis reported that Plaintiff said the Remeron was "very helpful," allowed her to sleep six hours, and had no side effects. (R. 325.)

On October 21, 2002, the day before the second hearing, the ALJ cancelled it. (R. 96.) The record contains no explanation for the cancellation. On November 15, 2002, Dr. Schiff sent a handwritten note to the ALJ stating, in its entirety: "[o]n reviewing the additional exhibits . . . I do not feel there is reason to change my opinion. Indeed, the treatment note dated 9 Sept 02 states 'she says the Remeron is very helpful.'" (R. 327.) The ALJ did not hold another hearing before issuing her decision on March 20, 2003.

## F.    The ALJ's decision

### 1.    The Five-step Test

The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A) (Title II); § 1382c(a)(3)(A) (Title XVI). The SSA has promulgated regulations establishing a five-step sequential evaluation process to determine disability:

(1)    Is the claimant currently working at a "substantial gainful activity?"
(2)    Does the claimant have a "severe impairment?" Do the claimant's physical or mental impairment(s) "significantly limit [claimant's] ability to do basic work activities?"

14

(3) Does the impairment meet or equal one of the impairments listed in Appendix 1?[18]

(4) Can the claimant do his past relevant work?

(5) Can the claimant perform other jobs existing in significant numbers in the national economy?

20 C.F.R § 404.1520 (governing claims for DIB); § 416.920 (parallel regulation governing claims for SSI). If at any step the SSA can make a finding of disability or non-disability, the agency will not review the claim further. *Id.* The burden of proof is on the claimant through step four, and only shifts to the Commissioner at step five. *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004) (citation omitted). At step three, if the SSA determines that the impairment is on the list of impairments found in Appendix 1, the claimant qualifies as disabled, without further inquiry regarding his age, education, or work experience. *Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003); 20 C.F.R. §§ 404.1520(d), 416.920(d). At the fourth and fifth steps, the ALJ must assess the claimant's residual functional capacity ("RFC"), i.e., work-related activities the claimant can perform despite her limitation, based on all relevant evidence in the record. *Id.* at 25; 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

## 2. The ALJ's Findings and Reasoning

The ALJ applied the five-step test and concluded at step four that Plaintiff was not disabled. (R. 13-17.) At step one, the ALJ noted that Plaintiff had performed some work after the alleged onset of her depression.[19] The ALJ declined to determine, however, whether such work constituted the kind of "substantial gainful activity" that would mandate a finding that Plaintiff was not disabled

---

[18] *See supra* note 15.

[19] Presumably, the ALJ was referring to Plaintiff's work as a cook at a bakery in 2000 and 2001. (R. 120, 123.)

at step one, stating that "there exists an independent basis for denying the claimant's application." (R. 14.) *See* 20 C.F.R § 404 .1520(a)(4)(i) (SSA will conclude that a claimant is not disabled at step one if the claimant is engaged in substantial gainful activity). Proceeding to step two, the ALJ found that Plaintiff's impairment met the definition of "severe" because it had more than a minimal effect on her ability to perform basic work activities. (*Id.*)

At step three, however, the ALJ determined that Plaintiff's depression, when evaluated under section 12.04 of Appendix 1 to Subpart P of 20 C.F.R. § 404, did not satisfy the criteria under either paragraph B or C.[20] (*Id.*) Specifically, the ALJ concluded that Plaintiff failed to satisfy paragraph B's requirement of "marked" difficulties or restrictions in three areas of functioning and "repeated episodes of decompensation" because Plaintiff had only "mild" difficulties and only one episode of decompensation. (*Id.*) The ALJ did not explain, however, how she determined that Plaintiff's difficulties were "mild," or whether the "one episode of decompensation" referred to Plaintiff's September 14, 2001 suicide attempt. Nor did the ALJ address the other suicide attempt alluded to by Dr. Nelson. (R. 229.) As for paragraph C, the ALJ found that Plaintiff did not satisfy the

---

[20]     Section 12.04 states that the required level of severity for affective disorders is met when the requirements in both paragraphs A and B are satisfied, or when the requirements of paragraph C are satisfied. For depression, paragraph A requires the presence of at least four symptoms, and paragraph B requires at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Paragraph C requires a medically documented history of a chronic affective disorder of at least 2 years' duration. 20 C.F.R. § 404 App. 1.

requirement of a medically documented history of a chronic disorder of at least two years' duration.[21] (R. 14.)

The ALJ then established Plaintiff's RFC, concluding that her impairment precluded Plaintiff from "performing more than unskilled work tasks." (R. 15.) The ALJ decided that the objective medical findings did not, however, support Plaintiff's claim of disabling symptoms or greater limitations. In reaching this determination, the ALJ noted that Plaintiff's condition improved during her "short course of treatment" at Chicago Read, where she was "alert and oriented in three spheres." (Id.) The ALJ also concluded that the "September 21, 2001 treatment notes establish the claimant was depressed due to[22] a recent separation from her spouse," and that Dr. Nelson's examination on December 4, 2001 "reveals that the claimant's depression was related to family conflicts and a recent divorce." (Id.)

The ALJ noted that during Dr. Nelson's examination, Plaintiff's "judgment was relatively intact, as was her insight," and she could name presidents, the mayor, and capitols. The ALJ found that Plaintiff was "oriented in all three spheres" in the examination, had no impairments of memory, and was not taking any psychotropic medications at the time. (Id.) The ALJ also emphasized that Dr. Lewis's March 18, 2002 progress notes "reveal the claimant reported a significant amount of improvement with prescribed medication," and reflected that Plaintiff was "oriented, coherent, more energetic, less depressed, and had no signs of suicidal ideation." (Id.)

---

[21]    The ALJ did not elaborate on this point, and the court notes that the first medical documentation related to Plaintiff's depression is from September 14, 2001. Nonetheless, the record contains no evidence to rebut Plaintiff's claim of disabling symptoms in October 2000.

[22]    As this court reads the September 21 treatment notes from Chicago Read, this sentence reads "since" her separation, not "due to." (R. 220.)

17

In reviewing the objective medical evidence, the ALJ declined to "fully credit" Dr. Lewis's opinion that Plaintiff could not maintain concentration or attention for more than two hours in an eight-hour day, or maintain a normal workday and workweek. (R. 16.) The ALJ noted that the limitations indicated by Dr. Lewis were "extremely restrictive," and that given those limitations, she expected to "see more serious objective findings." (Id.) In the ALJ's view, if Plaintiff were really so limited, "one would expect to see much more aggressive treatment measures pursued," rather than "fairly infrequent office visits" and "only a modest dose of medication." (Id.) The ALJ found Dr. Lewis's opinion inconsistent with his own treatment notes, which "indicate that the claimant's symptoms are substantially relieved with medication and treatment," and she felt that Dr. Lewis should have submitted more treatment notes given that he saw Plaintiff every month. (Id.) The ALJ found support for these conclusions from Dr. Schiff, who testified that Dr. Lewis's opinion was "not supported by the evidence of record or claimant's daily activities." (Id.)

With respect to the treatment notes and medical records submitted after the September 11, 2002 hearing, the ALJ noted that they "did not change the opinion of Dr. Schiff . . . [a]ccordingly, I find Dr. Schiff's testimony to be supported by the great weight of evidence in this case, and assess no weight to Dr. Lewis's opinion." (Id.) The ALJ also stated that these "same considerations led the state agency physicians[23] to discount Dr. Lewis's opinion" when they made their RFC assessments, and that those RFC assessments were consistent with her own. (Id.)

---

[23]     The ALJ did not identify the "physicians" but was presumably referring to the psychologists Dr. Brister and Dr. Wharton, who submitted RFC assessments for DDS. (R. 232, 240, 252.)

In addition to the objective medical evidence, the ALJ stated that she considered the factors described in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3),[24] as well as Social Security Ruling 96-7p,[25] and concluded that Plaintiff's own allegations of disabling symptoms and limitations could not be accepted because of inconsistencies in her statements and testimony, as well as problems with her credibility. (R. 16-17.) The ALJ noted, for example, that Plaintiff made contradictory statements on her November 2001 and February 2002 daily activities questionnaires. (R. 16.) The ALJ also determined that Plaintiff's testimony of limited daily activities was undermined by her admission that she watches television and reads, and that Plaintiff's assertion that she no longer trusts anyone was contradicted by the fact that she relies on her cousin to drive her places and allows her daughter to visit for one to two hours every few weeks. (Id.) The ALJ then noted, without elaboration, Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing." (R. 17.)

Proceeding to step four, the ALJ determined that Plaintiff could perform her past relevant work as "a packer or in factory assembly" because the "exertional and nonexertional requirements

---

[24]     Both regulatory sections incorporate the same factors, which are "(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

[25]     Under Social Security Ruling 96-7p, the ALJ's decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." See Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

of that job [were] consistent" with Plaintiff's RFC. (*Id.*) The ALJ made no findings as to the specific requirements of Plaintiff's past work, and did not explain how Plaintiff's functional limitations related to the performance of such work. The ALJ nevertheless found that Plaintiff retained the capacity to perform past relevant work, and concluded that she was not disabled. (*Id.*)

## DISCUSSION

### A.  Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court does not engage in its own analysis of whether Plaintiff is severely impaired as defined by the SSA regulations. *Young,* 362 F.3d at 1001 (citation omitted). Nor will it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support the conclusion." *Id.* (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The Seventh Circuit has noted the court's obligation to critically review the record to ensure that the ALJ did not "play doctor" by making "independent medical findings." *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996). Similarly, the court must also critically review the ALJ's decision to ensure that the ALJ has "articulate[d] some legitimate reason for his decision" and built an "accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel,* 227

20

F.3d 863, 872 (7th Cir. 2000). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## B. Analysis

Plaintiff argues that the ALJ's decision should be reversed because the ALJ failed to base her RFC and step four determinations on substantial evidence. (Plaintiff's Motion for Summary Judgment (hereinafter "Pl.'s Motion"), at 1-2, 21.) Plaintiff contends that the ALJ erroneously rejected Dr. Lewis's opinion when determining Plaintiff's RFC, (*id.* at 15-17), failed to make a sufficiently detailed RFC assessment, (*id.* at 12-14), failed to detail the "actual functional demands" of Plaintiff's past relevant work at step four, (*id.* at 18-19), and failed to fully and fairly develop the medical record. (*Id.* at 20-21.) Because Plaintiff's first and last arguments are closely related, the court will begin by considering whether the ALJ properly rejected Dr. Lewis's opinion, and, if so, whether the ALJ should have further developed the medical record before issuing her decision.

## 1. The ALJ's Rejection of Dr. Lewis's Opinion

SSA regulations require that an ALJ accord controlling weight to a treating physician's opinion regarding the nature and severity of a medical condition if that opinion is supported by objective medical findings and is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). An ALJ may, however, discount a treating physician's medical opinion if it is inconsistent with other medical opinions, *Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002), or if it is internally inconsistent. *Skarbek*, 390 F.3d at 503 (citing *Clifford*, 227 F.3d at 871). The ALJ may also discount a treating

physician's opinion if she doubts its credibility, as long as she supports her decision with substantial evidence. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

Here, the ALJ rejected the opinion of Dr. Lewis, the treating physician, because she found it internally inconsistent and unsupported by the evidence. (R. 16.)   Plaintiff objects to this conclusion, arguing that the ALJ was "play[ing] doctor" and "simply indulg[ing] her own lay view of depression." (Pl.'s Motion, at 16-17.) In particular, Plaintiff takes issues with the ALJ's comments that, based on Dr. Lewis's opinion that Plaintiff had such "extremely restrictive" limitations, the ALJ expected to see "more serious objective findings" and "much more aggressive treatment measures," rather than "fairly infrequent office visits" and "only a modest dose of medication." (R. 16.)

An ALJ may not make her own independent medical findings. *Rohan*, 98 F.3d at 970 (holding that the ALJ erred by deciding, without relying on any medical evidence, that the claimant's efforts at a small machine repair and resale business were incompatible with a diagnosis of major depression). Further, the Seventh Circuit has held that an ALJ impermissibly "plays doctor" in rejecting the opinion of a treating physician if she substitutes her own judgment for that of medical professionals, without addressing or relying on relevant medical evidence or authority in the record. *Clifford*, 227 F.3d at 870 (holding that the ALJ erred by determining that the claimant's daily activities were inconsistent with a treating physician's opinion of severe restrictions without citing to any other medical evidence in the record that contradicted the treating physician's opinion); *c.f. Dixon*, 270 F.3d at 1177-78 (finding that the ALJ did not impermissibly "play doctor" because she thoroughly discussed the relevant medical evidence).

On their face and out of context, the ALJ's comments about the lack of aggressive treatment and the modest dose of medication might seem to violate these standards. The court notes, however,

22

that the ALJ made these comments while discussing the testimony of Dr. Schiff, who stated that he was puzzled by Dr. Lewis's diagnosis of major depression because Plaintiff was responding to a "modest dose" of medication such that Dr. Lewis never felt the need to increase it. (R. 44.) To the extent the ALJ was relying on Dr. Schiff's testimony in assessing Plaintiff's treatment and medication, she did not impermissibly "play doctor" by pointing out an apparent inconsistency between Plaintiff's course of treatment and Dr. Lewis's opinion.

The ALJ also rejected Dr. Lewis's opinion on the basis that it was inconsistent with his own treatment notes, which "indicate that the claimant's symptoms are substantially relieved with medication and treatment." (R. 16.) Indeed, a statement that Plaintiff's depression was "substantially relieved" is arguably inconsistent with Dr. Lewis's opinion that her depression "continues to be disabling" and causes "marked" difficulties in her functioning. (R. 256, 326.) *See Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995) (holding that the ALJ properly rejected treating physician's opinion of disability from degenerative disc disease where the doctor's treatment notes were inconsistent with his opinion that the claimant was severely limited).

As for the ALJ's conclusion that Dr. Lewis's opinion was internally contradictory, Dr. Schiff testified as much during the hearing. He noted that Dr. Lewis had not provided a "robust mental status," and stated that he found Dr. Lewis's July 8, 2002 RFC assessment "internally contradictory" because Dr. Lewis wrote "no longer suicidal" yet indicated suicidal ideation when checking off Plaintiff's symptoms. (R. 44, 257-58.) Dr. Schiff also reiterated in his post-hearing note to the ALJ that Dr. Lewis's September 9, 2002 treatment notes indicate that Plaintiff found the Remeron "very helpful," (R. 325, 327), which is arguably inconsistent with Dr. Lewis's conclusion that Plaintiff has "marked" restrictions in her daily activities and functioning.

23

Less persuasive is the ALJ's concern that Dr. Lewis produced very few treatment notes despite Plaintiff's testimony that she saw him for 30 to 60 minutes each month. (R. 16.) Plaintiff did testify that she had monthly appointments with Dr. Lewis, and that she had seen him "more than six" times. (R. 30-31, 41.) As discussed below, however, Plaintiff's testimony was characterized by communication and language problems. In addition, Dr. Lewis reported in July 2002 that he had seen Plaintiff every *other* month, not every month. (R. 257.) It is true that as of the September 2002 hearing, Dr. Lewis had submitted treatment notes only for March 2002, despite records indicating that he began treating Plaintiff on January 28, 2002. (R. 234-36, 238.) Plaintiff testified, however, that she skipped two months of appointments after her first visit, (R. 30), which explains two-month gap in her treatment notes.

After the ALJ requested more treatment notes at the hearing, (R. 45-46), Dr. Lewis submitted additional treatment notes for September 2002.[26] (R. 325.) Assuming Plaintiff saw Dr. Lewis every other month as indicated by Dr. Lewis, then the ALJ was only missing treatment notes for May and July. The lack of treatment notes for July, moreover, is mitigated by the fact that Dr. Lewis submitted a comprehensive assessment of Plaintiff's condition on July 8, 2002. (R. 254-61.) Given that the evidence does not conclusively establish that Plaintiff saw Dr. Lewis more frequently, the court does not view the lack of treatment notes alone as grounds for rejecting Dr. Lewis's opinion.

---

[26]     Dr. Lewis also submitted an RFC assessment that he had completed for Plaintiff's attorney in July 2002, (R. 257-61), and an opinion of Plaintiff's condition in October 2002. (R. 326). However, the only actual treatment notes were the two from March and September 2002. (R. 238, 325.)

The court is also not persuaded by the ALJ's assertion that the "state agency physicians"—presumably Dr. Brister and Dr. Wharton, who are actually psychologists — "discount[ed] Dr. Lewis' opinion." (R. 16.) As Plaintiff correctly points out in her brief, neither Dr. Brister nor Dr. Wharton ever saw Dr. Lewis's opinion; both based their assessments on Plaintiff's progress notes from Chicago Read, and on Dr. Nelson's evaluation. (R. 232, 252.) Since neither had seen Dr. Lewis's opinion, it would be quite impossible for them to discount it.

Despite these concerns, the court need not resolve, for purposes of this decision, whether the ALJ erred in concluding that Dr. Lewis's opinion was inconsistent and unsupported by the evidence. Assuming without deciding that the ALJ permissibly rejected Dr. Lewis's opinion, the court nonetheless finds that the ALJ did not base her final decision on substantial evidence.

## 2. The Sufficiency of the Record Without Dr. Lewis's Opinion

Once the ALJ decided to accord "no weight" to Dr. Lewis's opinion, she needed to cite sufficient evidence left in the record upon which to base her decision or, in the absence of such evidence, to develop the record further. Aside from Dr. Lewis's opinion, the remaining evidence available for consideration came from Dr. Schiff, the testifying medical expert; Dr. Brister and Dr. Wharton, the "state agency physicians"; Dr. Nelson, the DDS evaluator; and Plaintiff's treatment notes from Chicago Read.

Of all the medical evidence in the record, the ALJ appears to have relied most heavily on Dr. Schiff's testimony, stating "I find Dr. Schiff's testimony to be supported by the great weight of evidence in this case." (R. 16.) The problem with this assessment is that Dr. Schiff's medical opinion about Plaintiff's impairment was that he had no opinion. Indeed, when the ALJ asked Dr. Schiff if there was sufficient information for him to render an opinion as to Plaintiff's impairments,

he answered "no," and testified that the record was "perplexing" and "not adequate for me to understand what's going on . . . ." (R. 42.) As noted above, Dr. Schiff did have an opinion of Dr. Lewis, whose opinion he found inconsistent and unsupported by the evidence; he had no opinion of Plaintiff's impairment, however.

Even after the ALJ continued the hearing to a later date in the hope that Plaintiff's hospital records and additional treatment notes would enable Dr. Schiff to render his opinion, (R. 45-47), he apparently remained unable to form one. After reviewing the hospital records and Dr. Lewis's treatment notes from September 2002, Dr. Schiff wrote a note to the ALJ on November 15, 2002 stating, "I do not feel there is reason to change my opinion." (R. 327.) Since he had not been able to form an opinion before, it stands to reason that he continued to believe that the record was insufficient to enable him to form an opinion. Dr. Schiff did note that Plaintiff found the Remeron "very helpful," but he did not otherwise address any of Dr. Lewis's continued concerns or offer a specific opinion regarding Plaintiff's mental state. (Id.)

As for Dr. Brister and Dr. Wharton, the ALJ noted only that their RFC assessments were consistent with her own. (R. 16.) The ALJ did not provide any discussion regarding the substance of the assessments, but merely stated that the two state agency psychologists had discounted Dr. Lewis's opinion in arriving at their RFC determinations. As noted however, Dr. Brister and Dr. Wharton could not have discounted Dr. Lewis's opinion because neither had access to it when they made their RFC assessments. The ALJ appears to have been under a misconception as to how Dr. Brister and Dr. Wharton – neither of whom ever examined Plaintiff – arrived at their conclusions, which calls into question her decision to rely on those conclusions.

That leaves Dr. Nelson and the Chicago Read treatment notes. The ALJ discussed Dr. Nelson's evaluation of Plaintiff, particularly his findings that she was oriented in three spheres; had no defects in abstract functioning, insight, or judgment; demonstrated no memory impairments; and could name political figures and capitol cities. (R. 15.) The ALJ did not, however, address the fact that Dr. Nelson found it difficult to communicate with Plaintiff "due to her mental state and the language barrier," or that Plaintiff had trouble answering Dr. Nelson's questions, even with the aid of an interpreter.[27] (R. 228.) In fact, perhaps due to these difficulties, Dr. Nelson appeared to have had trouble obtaining correct information. For instance, he wrote that Plaintiff told him she had "never been hospitalized psychiatrically" and was not taking medication, but Plaintiff had indeed been hospitalized quite recently, and had disclosed on her November 23, 2001 questionnaire – less than two weeks before seeing Dr. Nelson – that she was taking both Zoloft and Ambien. (R. 128.) Dr. Nelson also failed to discover that Plaintiff had a daughter who died in a drowning accident – a matter that is arguably relevant to the issue of depression – even though he took a fairly extensive family history. (R. 228.) Significantly, Plaintiff had told Dr. Lewis this information on her first visit to AHS.

The ALJ also failed to discuss Dr. Nelson's other conclusions, namely that Plaintiff had been "chronically depressed for a number of years," and that she experienced frequent headaches, frequent crying spells, persistent feelings of low self-esteem, difficulties concentrating, and chronic insomnia. (R. 229.) Nor did the ALJ address Dr. Nelson's finding that Plaintiff had a history of suicidal

---

[27]      Dr. Nelson mentions the presence of an unidentified "interpreter" only once, (R. 228), and does not indicate whether her or she was provided by DDS. The court notes that Plaintiff's cousin accompanied her to the evaluation, but the record contains no evidence as to the cousin's proficiency in either English or Vietnamese.

27

ideation, including two suicide attempts (R. 229); in fact, the ALJ makes no mention of a second suicide attempt. In short, the ALJ appears to have relied on the part of Dr. Nelson's evaluation that supported a finding of less severe depression, while ignoring both his other contrary findings and the obvious and significant communication problem during the examination. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (noting that an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion").

As for the Chicago Read notes, the ALJ discussed the fact that Plaintiff's symptoms improved during her stay there, and that she was "alert and oriented in three spheres." (R. 15.) The ALJ failed to note, however, that Chicago Read initially assigned Plaintiff a GAF of 20-30, which indicated serious impairment in judgment or an inability to function in almost all areas. *See* DSM-IV, at 34. More troubling is the ALJ's conclusion that the treatment notes "establish the claimant was depressed *due to* a recent separation from her spouse." (R. 15.) (emphasis added.) As this court reads the notes in question, the doctor wrote "since" her separation, not "due to." (R. 220.) The ALJ's interpretation changes the meaning considerably, from a matter of timing to one of causation. Indeed, the ALJ appears to have formed an opinion that Plaintiff's depression was caused merely by her divorce, and was not chronic or recurring. Such an opinion does not appear to be supported by substantial evidence; in fact, both Dr. Lewis and Dr. Nelson described a long history of depression, with Dr. Lewis in particular noting recurring episodes with or without any precipitants. (R. 326.) On these facts, the court believes that the ALJ may have "simply indulged [her] own view of depression." *See Rohan*, 98 F.3d at 971; *see also Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("[s]evere depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it").

28

In light of Dr. Schiff's inability to form an opinion of Plaintiff's impairment, as well as the ALJ's misconception of Dr. Brister's and Dr. Wharton's opinions, failure to address relevant issues concerning Dr. Nelson's evaluation, and misinterpretation of the Chicago Read treatment notes, the court finds scant evidence in the record from which the ALJ could have made her disability determination once she had rejected Dr. Lewis's opinion. In each of the cases cited by Defendant where the ALJ rejected a treating physician's opinion, there were other treating physicians who had formed credible opinions. For instance, in *Knight*, the court found that the ALJ properly rejected one treating physician's opinion that the claimant was disabled from disc disease because the treatment notes failed to support the existence of severe restrictions. 55 F.3d at 313-14. The court noted, however, that this conclusion was "particularly justified" because other treating physicians had "provided well-documented medical tests and treatment notes stating that, other than her cancer, [the claimant] was in good health and that she experienced no residual functional limitations." *Id.* at 314. Similarly, in *Dixon*, the ALJ rejected the opinion of a treating physician in favor of the opinions of two other treating physicians, both of whom had offered assessments of the claimant's functional restrictions. 270 F.3d at 1178; *see also Skarbek*, 390 F.3d at 503-04 (holding that the ALJ permissibly rejected a treating doctor's opinion in favor of the opinions of two specialists, both of whom had independently examined the claimant and concluded that she could perform a limited range of medium work with certain restrictions).

In contrast, the ALJ here appears to have rejected Dr. Lewis's opinion in favor of Dr. Schiff's – "I find Dr. Schiff's testimony to be supported by the great weight of evidence in this case, and assess no weight to Dr. Lewis's opinion" – despite Dr. Schiff's explicit statement that he was unable to give an opinion regarding Plaintiff's restrictions. This case is thus distinguishable from the above cases

where the treating physician's opinion was rejected in favor of affirmative opinions offered by other doctors.

The court is mindful that the claimant bears the burden in steps one through four of the five-step test. *See Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). Thus, the claimant "must furnish medical and other evidence" that the SSA will use to make its disability determination. *See* 20 C.F.R. § 404.1512(a); *May v. Apfel*, No. 98 C 1647, 1999 WL 1011927, at *18-19 (N.D. Ill. Sept. 30, 1999) (finding the ALJ justified in concluding that the claimant had failed to meet her burden of proving the severity of her impairments at step three where the claimant failed to avail herself of numerous opportunities to provide the ALJ with supporting documentation). At the same time, however, an ALJ has a basic obligation to develop a full and fair record. *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) (citing *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991)). As part of that obligation, an ALJ should re-contact medical sources when the evidence received is inadequate to find whether the claimant is disabled. *C.f. Skarbek*, 390 F.3d at 504 (finding that the ALJ did not need to re-contact the treating physician because two other specialists had treated the claimant and rendered opinions).

Here, the ALJ initially appeared to recognize that the record was insufficient. When Dr. Schiff testified that he was unable to offer an opinion based on the record, the ALJ continued the hearing in the hope that he would be able to do so after obtaining Plaintiff's medical records and more of Dr. Lewis's treatment notes. (R. 45-46.) The ALJ promised to hold another hearing if, after receiving the supplemental information, Dr. Schiff still could not render an opinion as to Plaintiff's impairment. (R. 46.) The ALJ scheduled a second hearing for October 22, 2002, but cancelled it the day before for reasons not explained in the record. (R. 85-88, 96.) Dr. Lewis submitted his

30

supplemental assessment of Plaintiff's condition and his September 2002 treatment notes on October 16th, (R. 325-26), but the record does not reveal when Plaintiff submitted her 1992 Thorek Hospital records.

In any event, Dr. Schiff reviewed the extra submissions and wrote on November 15th that he had not changed his opinion. (R. 327.) As discussed above, Dr. Schiff's initial opinion was that he had no opinion; it thus follows that he still had no opinion. According to the ALJ's own promise at the September hearing, then, she should have held a supplemental hearing. She did not, and issued no explanation as to why. *See Pappas-Sanavaitis v. Chater*, 978 F. Supp. 782, 789 (N.D. Ill. 1997) (holding that the ALJ erred when he determined from claimant's testimony that a psychological evaluation was warranted, assured the claimant that he would obtain one, but then decided against it without explanation and ruled on the existing record he previously indicated was inadequate). If the record was insufficient for the ALJ to make a decision until Dr. Schiff offered his opinion, and he never did so, it is difficult to see how the ALJ decided that the record was sufficient after all, particularly since she never explained why she changed her mind.

The court thus finds that the ALJ did not base her findings on substantial evidence. As the ALJ initially suspected, the record was inadequate once she rejected Dr. Lewis's opinion of Plaintiff's limitations, and the case must now be remanded for further development of the record. In light of this conclusion, the court need not address Plaintiff's arguments that the ALJ failed to make a sufficiently detailed RFC assessment, (Pl.'s Motion, at 12-14), and failed to detail the "actual functional demands" of Plaintiff's past relevant work at step four. (*Id.* at 18-19.) The court notes, however, one other troubling aspect of the ALJ's decision.

The ALJ found Plaintiff not credible based on inconsistencies in her statements and testimony, and her "generally unpersuasive appearance and demeanor." (R. 17.) A court will not overturn a credibility determination as long as an ALJ articulates specific reasons for her findings that are supported by the record. *Skarbek*, 390 F.3d at 504-05 ("[a]n ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is 'patently wrong'"); *see* SSR 96-7p. In this case, the ALJ did identify specific instances of what she considered to be inconsistencies in Plaintiff's statements and testimony. She found that Plaintiff made contradictory statements on her November 2001 and February 2002 daily activities questionnaires; that her testimony of limited daily activities was undermined by her admission that she watches television and reads; and that her testimony of not trusting anyone was contradicted by the fact that she relies on her cousin to drive her places and allows her daughter to come for visits. (R. 16.) Of these, in the court's view, only the questionnaire statements are true inconsistencies. Reading and watching television for brief periods daily is not inconsistent with "limited daily activities." Similarly, the fact that Plaintiff receives visits from her daughter for one or two hours every few weeks and allows her cousin to drive her places does not necessarily establish that she trusts people. By labeling these as "inconsistencies," the ALJ arguably indulged her own view of how a truly depressed person should behave.

Finally, the ALJ failed to elaborate as to how Plaintiff's "appearance and demeanor" were "unpersuasive." (R. 17.) Although the ALJ is in the best position to observe witnesses and make credibility determinations based on their appearance, this case is more unusual in that Plaintiff is Vietnamese and speaks little or no English. Indeed, although the ALJ does not mention any such difficulties in her discussion, the transcript reveals that the ALJ had trouble communicating with

32

Plaintiff throughout the hearing, despite the presence of an interpreter.[28] Since the ALJ did not provide any specifics, the court is left to speculate as to how much of Plaintiff's "unpersuasive demeanor" might be attributed to language and cultural barriers.

## CONCLUSION

For the reasons discussed above, the case is remanded to the ALJ for further proceedings consistent with this opinion.

ENTER:

Dated: May 13, 2005

REBECCA R. PALLMEYER
United States District Judge

---

[28] For instance, the interpreter asked the ALJ several times to repeat her opening remarks explaining who she was and what the proceeding would entail. (R. 21-22.)